the bar for similar services.[36] We conclude that the trial court did not abuse its discretion by ordering Wade to pay attorney fees of $4,250.

## CONCLUSION

We conclude that the court abused its discretion by ordering the parties to alternately claim the dependency exemption for their minor child, but we otherwise affirm the decree. We modify the decree to award solely to Wade the dependency exemption attributable to the parties' daughter.

AFFIRMED AS MODIFIED.

---

[36] *Id.*

---

STATE OF NEBRASKA, APPELLEE, V.
DERRICK U. STRICKLIN, APPELLANT.

___ N.W.2d ___

Filed April 3, 2015.   No. S-14-182.

1. **Trial: Joinder: Appeal and Error.** A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion.
2. **Pleadings: Parties: Judgments: Appeal and Error.** A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown.
3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
4. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
5. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.
6. **Motions for New Trial: Appeal and Error.** A trial court's order denying a motion for new trial is reviewed for an abuse of discretion.
7. **Criminal Law: Trial.** In criminal prosecutions, the withdrawal of a rest in a trial on the merits is within the discretion of the trial court.
8. **Trial: Joinder.** There is no constitutional right to a separate trial.

9. **Trial: Joinder: Proof: Appeal and Error.** The burden is on the party challenging a joint trial to demonstrate how and in what manner he or she was prejudiced.

10. **Trial: Joinder: Indictments and Informations.** The propriety of a joint trial involves two questions: whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial.

11. **Trial: Joinder.** Consolidation is proper if the offenses are part of a factually related transaction or series of events in which both of the defendants participated.

12. **Rules of Evidence.** Under Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 2008), all relevant evidence is admissible unless there is some specific constitutional or statutory reason to exclude such evidence.

13. **Trial: Evidence.** Evidence which is not relevant is not admissible.

14. **Evidence: Words and Phrases.** Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

15. **Trial: Joinder.** A defendant is not considered prejudiced by a joinder where the evidence relating to both offenses would be admissible in a trial of either offense separately.

16. **Rules of Evidence: Hearsay: Proof.** Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.

17. **Rules of Evidence: Rules of the Supreme Court: Hearsay.** Hearsay is not admissible except as provided by the rules of evidence or by other rules adopted by the statutes of the State of Nebraska or by the discovery rules of the Nebraska Supreme Court.

18. **Rules of Evidence: Hearsay.** When an out-of-court statement relates the content of another out-of-court statement, there must be an independent hearsay exception for each statement.

19. **Confessions: Rules of Evidence.** For a statement against penal interest, the question under Neb. Evid. R. 804(2)(c), Neb. Rev. Stat. § 27-804(2)(c) (Reissue 2008), is always whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true.

20. ____: ____. As an initial matter, to qualify as a statement against penal interest under Neb. Evid. R. 804(2)(c), Neb. Rev. Stat. § 27-804(2)(c) (Reissue 2008), the statement must be self-inculpatory.

21. **Confessions: Rules of Evidence: Words and Phrases.** A "statement" within the meaning of Neb. Evid. R. 804(2)(c), Neb. Rev. Stat. § 27-804(2)(c) (Reissue 2008), is a specific individual statement that a proponent offers into evidence rather than the entire narrative of which the statement is a part.

22. **Rules of Evidence: Hearsay.** Individual remarks under examination pursuant to the hearsay exception of Neb. Evid. R. 804(2)(c), Neb. Rev. Stat. § 27-804(2)(c)

(Reissue 2008), must meet the test of whether the particular remark at issue meets the standard set forth in the rule.

23. \_\_\_\_: \_\_\_\_. In determining whether a statement is admissible under the residual hearsay exception to the hearsay rule, a court considers five factors: a statement's trustworthiness, the materiality of the statement, the probative importance of the statement, the interests of justice, and whether notice was given to an opponent.

24. \_\_\_\_: \_\_\_\_. In determining admissibility under the residual hearsay exception, a court must examine the circumstances surrounding the declaration in issue and may consider a variety of factors affecting the trustworthiness of a statement. A court may compare the declaration to the closest hearsay exception as well as consider a variety of other factors affecting trustworthiness, such as the nature of the statement, that is, whether the statement is oral or written; whether a declarant had a motive to speak truthfully or untruthfully, which may involve an examination of the declarant's partiality and the relationship between the declarant and the witness; whether the statement was made under oath; whether the statement was spontaneous or in response to a leading question or questions; whether a declarant was subject to cross-examination when the statement was made; and whether a declarant has subsequently reaffirmed or recanted the statement.

25. **Rules of Evidence: Hearsay: Appeal and Error.** Because of the factors a trial court must weigh in deciding whether to admit evidence under the residual hearsay exception, an appellate court applies an abuse of discretion standard to review hearsay rulings under this exception.

26. **Trial: Testimony: Appeal and Error.** The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion.

27. **Rules of Evidence: Witnesses: Prior Convictions.** When impeaching a witness pursuant to Neb. Evid. R. 609, Neb. Rev. Stat. § 27-609 (Reissue 2008), after the conviction is established, the inquiry must end there, and it is improper to inquire into the nature of the crime, the details of the offense, or the time spent in prison as a result thereof.

28. **Rules of Evidence: Witnesses.** Neb. Evid. R. 608(2), Neb. Rev. Stat. § 27-608(2) (Reissue 2008), permits questioning during cross-examination only on specific instances of conduct not resulting in a criminal conviction.

29. **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

30. **Jury Instructions: Appeal and Error.** The failure to object to instructions after they have been submitted to counsel for review will preclude raising an objection on appeal, unless there is a plain error indicative of a probable miscarriage of justice.

31. **Trial: Motions for Mistrial.** When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial.

32. **Motions for Mistrial: Prosecuting Attorneys: Waiver: Appeal and Error.** A party who fails to make a timely motion for mistrial based on prosecutorial

misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct.

33. **Rules of Evidence: Jurors: Affidavits.** Neb. Evid. R. 606(2), Neb. Rev. Stat. § 27-606(2) (Reissue 2008), does not allow a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstanding, thought processes, or discussions during deliberations.

34. **Jury Misconduct: Trial: Appeal and Error.** When an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent that the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur or that it was not prejudicial, adequate findings are to be made so that the determination may be reviewed.

35. **Witnesses: Juror Misconduct: Appeal and Error.** An appellate court reviews the trial court's determinations of witness credibility and historical fact for clear error and reviews de novo the trial court's ultimate determination whether the defendant was prejudiced by juror misconduct.

36. **Criminal Law: Jury Misconduct: Proof.** A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.

37. **Criminal Law: Juror Misconduct: Presumptions: Proof.** In a criminal case, misconduct involving an improper communication between a nonjuror and a juror gives rise to a rebuttable presumption of prejudice which the State has the burden to overcome.

38. **Jury Misconduct.** Whether prejudice resulted from jury misconduct must be resolved by the trial court's drawing reasonable inferences as to the effect of the extraneous information on an average juror.

39. **Trial: Evidence: Appeal and Error.** Among factors traditionally considered in determining whether to allow a party to reopen a case to introduce additional evidence are (1) the reason for the failure to introduce the evidence, i.e., counsel's inadvertence, a party's calculated risk or tactic, or the court's mistake; (2) the admissibility and materiality of the new evidence to the proponent's case; (3) the diligence exercised by the requesting party in producing the evidence before his or her case closed; (4) the time or stage of the proceedings at which the motion is made; and (5) whether the new evidence would unfairly surprise or unfairly prejudice the opponent.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

Jeremy C. Jorgenson for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

WRIGHT, CONNOLLY, STEPHAN, MCCORMACK, MILLER-LERMAN, and CASSEL, JJ., and MOORE, Chief Judge.

CASSEL, J.

# I. INTRODUCTION

This case is Derrick U. Stricklin's direct appeal from multiple felony convictions, including two convictions for first degree murder. Stricklin's convictions arose from the shooting deaths of Carlos Morales and Bernardo Noriega during a planned drug transaction. The State alleged that Stricklin committed the crimes with an accomplice, Terrell E. Newman, and the two were tried together. Stricklin's assignments of error relate to the consolidation of his and Newman's trials, the exclusion of statements made by a confidential informant, the scope of his cross-examination of the State's primary witness, the instructions given to the jury, prosecutorial misconduct, and juror misconduct. Finding no merit to his claims, we affirm his convictions and sentences.

# II. BACKGROUND

## 1. SHOOTINGS

Morales operated an automobile body shop in Omaha, Nebraska. On the morning of December 2, 2012, Morales' fiance dropped him off at the shop and returned home. At approximately 2:15 p.m., she returned to the shop to pick up Morales in order to take him to their son's birthday party.

Morales' fiance arrived at the shop, opened the shop's door, and called for Morales. When he did not respond, she climbed the stairs to the shop's office and saw Morales lying on his stomach with "blood coming out" of him. She observed another man lying face down, but she did not know who the man was. She called the 911 emergency dispatch center, but the operator was unable to understand her. She observed a man outside the shop, and the man was able to give the shop's address to the 911 operator.

Police officers identified the men in the office of Morales' shop as Morales and Noriega. Both men were deceased upon the officers' arrival, and autopsies revealed that both men died of gunshot wounds to the head.

While investigating the shootings, officers interviewed Jose Herrera-Gutierrez, who claimed to have been present during the incident. Although Herrera-Gutierrez did not know the names of the shooters, he had recognized them from prior occasions at Morales' shop. He knew that one of the shooters had a brother who was potentially a business partner of Morales' and that the other shooter was associated with a green Volkswagen Beetle that Herrera-Gutierrez had seen at Morales' shop. Based upon the information provided by Herrera-Gutierrez, officers compiled photographic lineups containing photographs of Stricklin and Newman, and Herrera-Gutierrez identified them as the shooters.

## 2. Trial

Stricklin was charged by information with seven counts, including two counts of first degree murder, attempted first degree murder, three counts of use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Newman was charged with the same offenses. Upon the State's motion, Stricklin's and Newman's trials were consolidated into a joint trial.

### (a) Herrera-Gutierrez' Testimony

The events of December 2, 2012, revolved around a drug transaction planned to occur at Morales' shop. Herrera-Gutierrez testified that Morales had asked him if he could get Morales some cocaine. Herrera-Gutierrez and Noriega were supposed to deliver the cocaine to the shop.

At approximately 11:30 a.m., Herrera-Gutierrez and Noriega left a restaurant to go to Morales' shop. Upon their arrival, Herrera-Gutierrez exited the vehicle and telephoned Morales to unlock the shop's door. Morales opened the door and came outside. Herrera-Gutierrez saw Noriega linger in the vehicle for a moment, grab something, and put it underneath his arm. Herrera-Gutierrez testified that the thing Noriega had grabbed was "that cocaine."

The three proceeded into Morales' shop and up the stairs to the shop's office. Herrera-Gutierrez testified that when they arrived in the office, two black males were already present.

Herrera-Gutierrez identified them as Stricklin and Newman. And he testified that he had recognized them from prior visits to the shop. He had seen Stricklin approximately four times at the shop, and he had seen Newman approximately three times at the shop. However, he had never learned their names, because Morales had not mentioned any names.

Upon entering the office, Noriega gave the cocaine to Morales and Morales set the cocaine on a table. Newman approached the table, and he and Morales opened the cocaine. Although Stricklin had a "see-through bag" containing wrinkled bills, Newman told Morales that he was going to get the money.

Newman turned around as if he was going to leave the office. But rather than leaving, he turned back around with a gun in his hand. Newman pointed the gun at them, and Herrera-Gutierrez saw that Stricklin also had a gun. Newman instructed Morales to tell Herrera-Gutierrez and Noriega to lie down. Herrera-Gutierrez and Noriega lay face down on the ground. Newman tied Herrera-Gutierrez' wrists, and a piece of plastic was wrapped around his face. Although Herrera-Gutierrez was able to breathe, he was unable to see if Stricklin and Newman were doing the same to Noriega.

Herrera-Gutierrez heard Stricklin and Newman instruct Morales to lie down as well. He heard Morales say, "No, you respect me, my house is your second house," and Newman reply, "I'm sorry, [Morales], business is business." Herrera-Gutierrez felt Morales lie down close to him. Herrera-Gutierrez was then lifted up a "little bit" and a plastic bag was placed over his head. Right after the bag was placed over his head, he heard "boom, boom, boom" and someone screaming. He testified that he heard two or three gunshots.

Herrera-Gutierrez started to feel like he was "asphyxiating." After he heard the shots, he heard a voice that he thought was Noriega, "lamenting, like AH, AH, AH." He then heard one more shot.

Someone grabbed Herrera-Gutierrez, the bag was taken off his head, and his hands were untied. He was dropped back to the ground, where he stayed and did not try to move. He heard footsteps, as if someone was walking quickly, and

then heard someone turn around, as if the person had forgotten something and returned to grab it. After approximately 5 minutes, Herrera-Gutierrez turned around and saw a "circle" of blood where Morales was lying. He called out to Morales, but Morales made no response. Herrera-Gutierrez ran out of the office, walked down a nearby street, and was eventually picked up by a passing driver. After being dropped off, he traveled to the home of Noriega's family in order to tell them what had happened.

### (b) Verdicts and Sentences

The jury returned verdicts finding Stricklin guilty of two counts of first degree murder, three counts of use of a deadly weapon to commit a felony, attempted intentional manslaughter, and possession of a deadly weapon by a prohibited person.

Stricklin was sentenced to life imprisonment for each of the first degree murder convictions, 15 to 25 years' imprisonment for each of the three use of a deadly weapon convictions, 20 months' to 5 years' imprisonment for the attempted intentional manslaughter conviction, and 15 to 25 years' imprisonment for the possession of a deadly weapon by a prohibited person conviction. Each sentence was ordered to run consecutively.

### 3. Appeal

Stricklin filed a timely notice of appeal—an appeal which is taken directly to this court.[1]

## III. ASSIGNMENTS OF ERROR

Stricklin assigns, restated and reordered, that the district court erred in (1) consolidating his and Newman's trials, overruling his motion to sever, and permitting the State to use exhibit 288; (2) excluding the statements of a confidential informant; (3) prohibiting him from questioning Herrera-Gutierrez concerning his prior drug dealing; (4) failing to include all relevant and mandatory language in the instructions given to the jury; (5) overruling his motion for new

---

[1] See Neb. Rev. Stat. § 24-1106(1) (Reissue 2008).

trial on the basis of juror misconduct; and (6) overruling his motion to reopen the evidence. Stricklin further asserts that the State committed prosecutorial misconduct during its closing argument.

## IV. STANDARD OF REVIEW

[1,2] A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion.[2] A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown.[3]

[3,4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[4] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[5]

[5] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[6]

[6] A trial court's order denying a motion for new trial is reviewed for an abuse of discretion.[7]

[7] In criminal prosecutions, the withdrawal of a rest in a trial on the merits is within the discretion of the trial court.[8]

## V. ANALYSIS

We address Stricklin's assignments of error in the order in which they occurred before the district court, beginning with the consolidation of his and Newman's trials.

---

[2] *State v. Foster*, 286 Neb. 826, 839 N.W.2d 783 (2013).

[3] *Id*.

[4] *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013).

[5] *Id*.

[6] *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015).

[7] *Id*.

[8] *State v. Bossow*, 274 Neb. 836, 744 N.W.2d 43 (2008).

## 1. Joint Trial

[8,9] Stricklin contends that the district court erred in granting the State's motion to consolidate his and Newman's trials and in overruling his subsequent motion to sever. The law governing separate and joint trials is well settled. There is no constitutional right to a separate trial.[9] The right is statutory and depends upon a showing that prejudice will result from a joint trial.[10] The burden is on the party challenging a joint trial to demonstrate how and in what manner he or she was prejudiced.[11]

[10] The propriety of a joint trial involves two questions: whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial.[12]

[11] As to the first question, the district court specifically found that Stricklin and Newman could have been charged in a single indictment or information. We find no error in this conclusion. The charges against Stricklin and Newman were identical and arose from their alleged involvement in the shooting deaths of Morales and Noriega. Consolidation is proper if the offenses are part of a factually related transaction or series of events in which both of the defendants participated.[13]

As to prejudice, Stricklin's arguments arise from the admission of certain evidence at trial, specifically Newman's cell phone records and exhibit 288. Cell phone records played a significant role at trial in corroborating Herrera-Gutierrez' testimony and in tying Stricklin and Newman to Morales' shop on December 2, 2012. Newman's cell phone records showed multiple calls with Morales and Stricklin on December 2. And exhibit 288 showed six calls received by Newman from

---

[9] *Foster, supra* note 2.

[10] *Id.* See Neb. Rev. Stat. § 29-2002 (Reissue 2008).

[11] *Foster, supra* note 2.

[12] *Id.*

[13] *Id.*

11:42 a.m. to 12:36 p.m. and indicated that the cell tower used to service Newman's cell phones for the calls was located in the immediate vicinity of Morales' shop.

Stricklin asserts that he was prejudiced by the admission of Newman's cell phone records and exhibit 288, because this evidence would not have been admissible against him in a separate trial. We disagree.

[12-14] Both the evidence of Newman's cell phone records and exhibit 288 would have been relevant, admissible evidence in a separate trial against Stricklin. Under Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 2008), all relevant evidence is admissible unless there is some specific constitutional or statutory reason to exclude such evidence.[14] Evidence which is not relevant is not admissible.[15] Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[16]

The State's theory of the case was that Stricklin and Newman committed the crimes together. And the State presented the testimony of Herrera-Gutierrez identifying Stricklin and Newman as the shooters. Newman's cell phone records and exhibit 288 served to bolster the State's theory and to corroborate Herrera-Gutierrez' identification of Stricklin and Newman. Newman's cell phone records showed that Newman was in communication with both Morales and Stricklin on the day of the shootings. And from exhibit 288, the jury could properly infer that Newman was in some proximity to Morales' shop at the time that he received the six calls. Because Newman was Stricklin's alleged accomplice, this evidence further supported the State's theory and was relevant to the issue of Stricklin's guilt.

[15] Because the evidence of Newman's cell phone records and exhibit 288 would have been admissible against Stricklin

---

[14] *Blue Valley Co-op v. National Farmers Org.*, 257 Neb. 751, 600 N.W.2d 786 (1999).

[15] See rule 402.

[16] Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2008).

in a separate trial, Stricklin has failed to show that the consolidation of his and Newman's trials caused him prejudice. A defendant is not considered prejudiced by a joinder where the evidence relating to both offenses would be admissible in a trial of either offense separately.[17]

Stricklin further claims that exhibit 288 was a demonstrative exhibit for which a limiting instruction was required, and he attempts to compare this case to *State v. Pangborn*.[18] In *Pangborn*, we determined that the trial court abused its discretion in permitting the jury to use a demonstrative exhibit during deliberations without providing a limiting instruction.[19]

Contrary to Stricklin's assertion, exhibit 288 was not admitted as a demonstrative exhibit, but as substantive evidence. Foundation was provided for the calls and the location of the cell tower shown on the exhibit, and the exhibit was admitted into evidence. Thus, no limiting instruction was required. This assignment of error is without merit.

## 2. Confidential Informant

Stricklin assigns that the district court erred in excluding evidence of statements made by a confidential informant. And he argues that the exclusion of the statements violated his constitutional right to present a complete defense.

### (a) Facts

At a hearing on the defendants' motions in limine, a detective testified as to certain statements made by an informant who had spoken to Morales approximately 1 week before the shootings. According to the detective, the informant stated that Morales was seeking to obtain two firearms, because he was having problems with two black males. The informant stated that one of the male's nicknames was "Sip."

According to the detective, the informant was not sure of the origin of Morales' problems with the males. But the informant

---

[17] *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013).

[18] *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013).

[19] See *id*.

believed that Morales' problems possibly arose from a "drug tax" for selling drugs in the neighborhood. However, Morales never told the informant exactly what the tax was for. The informant further stated that he did not provide Morales with any firearms.

Additionally, the detective testified that he met with the informant on two occasions and that he showed the inform-ant photographic lineups containing photographs of Stricklin and Newman. However, the informant did not identify either Stricklin or Newman as being "Sip."

The district court excluded the evidence of the confidential informant's statements on the basis that the evidence contained two levels of hearsay: (1) Morales' statements to the informant and (2) the informant's statements to the detective. And the court concluded that Morales' statements did not fall under either the exception for statements against interest[20] or the residual hearsay exception.[21]

### (b) Resolution

[16,17] Our case law and rules of evidence provide that hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted.[22] Hearsay is not admissible except as provided by the rules of evidence or by other rules adopted by the statutes of the State of Nebraska or by the dis-covery rules of the Nebraska Supreme Court.[23]

[18] Stricklin does not contest the district court's conclusion that the evidence of the confidential informant's statements contained two levels of hearsay. When an out-of-court state-ment relates the content of another out-of-court statement, there must be an independent hearsay exception for each

---

[20] Neb. Evid. R. 804(2)(c), Neb. Rev. Stat. § 27-804(2)(c) (Reissue 2008).

[21] Rule 804(2)(e).

[22] See, Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2008); *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[23] See, Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 2008); *State v. Alford*, 278 Neb. 818, 774 N.W.2d 394 (2009).

statement.[24] We discuss each of the hearsay exceptions considered by the district court.

### (i) Statement Against Interest

Rule 804(2)(c) provides that when the declarant is unavailable as a witness, a statement may be admitted when it,

> at the time of its making . . . so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

[19] For a statement against penal interest, the question under rule 804(2)(c) is always whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to be true.[25]

[20] None of Morales' statements were sufficiently against his penal interest so as to fall within the purview of rule 804(2)(c). Morales had stated that he sought to obtain two firearms, that he was having trouble with two black males, that one of the males was called Sip, that the males wanted him to pay a tax, and that he owed "a lot" of money. None of these statements tended to expose Morales to criminal liability. Morales had not disclosed the basis for the tax or admitted to selling drugs; the informant only assumed that the tax was for selling drugs. Further, the informant stated that he did not provide Morales with any guns. As an initial matter, to qualify as a statement against penal interest under rule 804(2)(c), the statement must be self-inculpatory.[26]

[21,22] Stricklin argues that the investigation into the shootings revealed that Morales was in fact selling drugs. But

---

[24] See, Neb. Evid. R. 805, Neb. Rev. Stat. § 27-805 (Reissue 2008); *State v. Neujahr*, 248 Neb. 965, 540 N.W.2d 566 (1995).

[25] See *State v. Phillips*, 286 Neb. 974, 840 N.W.2d 500 (2013).

[26] See *id*.

in considering whether a statement qualifies as a statement against penal interest, a court must constrain its analysis to the individual statement at issue.[27] A "statement" within the meaning of rule 804(2)(c) is a specific individual statement that a proponent offers into evidence rather than the entire narrative of which the statement is a part.[28] Individual remarks under examination pursuant to the hearsay exception of rule 804(2)(c) must meet the test of whether the particular remark at issue meets the standard set forth in the rule.[29] Morales' statements, standing alone, did not tend to expose him to criminal liability. Thus, his statements did not fall within the purview of rule 804(2)(c).

### (ii) Residual Hearsay Exception

Under rule 804(2)(e), when the declarant is unavailable as a witness, a hearsay statement "not specifically covered" by any other hearsay exception may still be admitted if the statement has "equivalent circumstantial guarantees of trustworthiness" and the court determines that

> (i) the statement is offered as evidence of a material fact, (ii) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (iii) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Further, the proponent of the statement must notify the adverse party of his or her intent to offer the statement and of the particulars of the statement, including the name and address of the declarant.[30]

[23] We have stated that in determining whether a statement is admissible under the residual exception to the hearsay rule, a court considers five factors: a statement's trustworthiness, the materiality of the statement, the probative importance of

---

[27] See *id.*

[28] See *id.*

[29] See *id.*

[30] See rule 804(2)(e).

the statement, the interests of justice, and whether notice was given to an opponent.[31]

[24] Moreover, in determining admissibility under the residual hearsay exception, a court must examine the circumstances surrounding the declaration in issue and may consider a variety of factors affecting the trustworthiness of a statement.[32] A court may compare the declaration to the closest hearsay exception as well as consider a variety of other factors affecting trustworthiness, such as the nature of the statement, that is, whether the statement is oral or written; whether a declarant had a motive to speak truthfully or untruthfully, which may involve an examination of the declarant's partiality and the relationship between the declarant and the witness; whether the statement was made under oath; whether the statement was spontaneous or in response to a leading question or questions; whether a declarant was subject to cross-examination when the statement was made; and whether a declarant has subsequently reaffirmed or recanted the statement.[33]

[25] Because of the factors a trial court must weigh in deciding whether to admit evidence under the residual hearsay exception, an appellate court applies an abuse of discretion standard to review hearsay rulings under this exception.[34]

Using these factors, we find no abuse of discretion in the district court's conclusion that Morales' statements were not admissible under the residual hearsay exception. Morales' statements did not exhibit similar guarantees of trustworthiness as a statement against penal interest, because his statements did not incriminate him in any wrongdoing. As to other factors affecting trustworthiness, Morales' statements were oral, the circumstances of the statements in seeking to obtain illegal firearms did not necessarily motivate Morales to speak truthfully, the statements were not made under oath, Morales

[31] See *State v. Epp*, 278 Neb. 683, 773 N.W.2d 356 (2009).

[32] *Phillips, supra* note 25.

[33] *Id*.

[34] *Epp, supra* note 31.

was not subject to cross-examination, and there is no evidence that Morales subsequently reaffirmed the statements.

We further consider the probative value of Morales' statements in addition to their trustworthiness. Stricklin asserts that Morales' statements proved that two other black males had a motive to kill Morales. However, Morales' statements did not prove that Stricklin and Newman were innocent of the crimes. And his statements were not evidence of third-party guilt. The statements established only that Morales was having problems with persons other than Stricklin and Newman.

The above factors demonstrate that Morales' statements failed to exhibit sufficient guarantees of trustworthiness in order to be admitted under the residual hearsay exception. Because Morales' statements were inadmissible hearsay, we find no error in the exclusion of the evidence of the confidential informant's statements under the hearsay rule.

### (iii) Complete Defense

Stricklin relies on *Holmes v. South Carolina*[35] for the assertion that the exclusion of the confidential informant's statements violated his constitutional right to present a complete defense. In *Holmes*, the U.S. Supreme Court held that a defendant's right to present a complete defense was violated when the trial court used an arbitrary rule to exclude evidence of third-party guilt.

However, in *State v. Phillips*,[36] we addressed a similar argument and concluded that the exclusion of a hearsay statement under the hearsay rule did not violate a defendant's right to present a complete defense. In the case at bar, the evidence of the confidential informant's statements was properly excluded under the hearsay rule. Thus, Stricklin's right to present a complete defense was not violated.

---

[35] *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006).

[36] See *Phillips*, *supra* note 25.

### 3. Cross-Examination of
### Herrera-Gutierrez

Stricklin assigns that the district court abused its discretion in limiting the scope of his cross-examination of Herrera-Gutierrez. He contends that he should have been permitted to question Herrera-Gutierrez regarding his gang affiliation, his knowledge of the confidential informant, and his history of drug trafficking, including the circumstances of a 2002 conviction.

### (a) Facts

Before Herrera-Gutierrez testified, the State moved to prevent Stricklin and Newman from asking any questions regarding Herrera-Gutierrez' membership in a gang and, specifically, his affiliation with "MS-13." The State further sought to prevent any questions regarding Herrera-Gutierrez' knowledge of the confidential informant. The district court sustained the State's motion as to the informant and as to Herrera-Gutierrez' affiliation with "MS-13." But it permitted the defendants to make a general inquiry into his membership in a gang.

And during cross-examination, Newman's counsel asked Herrera-Gutierrez, "You're pretty familiar with the sale of drugs. Is that fair to say?" Herrera-Gutierrez responded, "I don't think so because if it was that way, I would have a nice house, cars, but I didn't have money to pay my rent." Newman's counsel then asked, "You went to federal prison for it, didn't you?" The State objected, and the district court determined that the form of the question was improper.

Newman's counsel made an offer of proof, in which Stricklin joined, that Herrera-Gutierrez had been indicted by a federal court in 2002, had signed a plea agreement as to one count of knowingly and intentionally distributing less than 50 grams of methamphetamine, and had pled guilty. The district court explained that Herrera-Gutierrez could be questioned regarding the prior conviction and that if he denied it, the record of conviction could be offered. However, the court determined that he could not be asked any questions regarding the circumstances of the conviction. And it further

provided that any questions regarding the sale of drugs were to be limited to the individuals and locations involved in this case.

### (b) Resolution

Stricklin's assertions regarding Herrera-Gutierrez' affiliation with a gang and his knowledge of the confidential informant are without merit. There was no indication that Herrera-Gutierrez was a member of "MS-13." Further, the district court permitted the defendants to ask general questions as to Herrera-Gutierrez' membership in a gang, and neither defendant chose to do so. As to Herrera-Gutierrez' knowledge of the confidential informant, the court correctly concluded that Herrera-Gutierrez could provide no testimony that would overcome the exclusion of the confidential informant's statements under the hearsay rule.

[26] As to the scope of cross-examination, we find no abuse of discretion in the limitation of questions regarding Herrera-Gutierrez' history of drug trafficking and his 2002 conviction. The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion.[37]

[27] Evidence of the circumstances of Herrera-Gutierrez' 2002 conviction was inadmissible under Neb. Evid. R. 609, Neb. Rev. Stat. § 27-609 (Reissue 2008). That rule permits the offer of evidence of a witness' having committed a crime punishable by death or imprisonment of more than 1 year, or a crime which involved dishonesty or false statement regardless of the punishment, provided that not more than 10 years have elapsed since the date of such conviction or of the release of the witness from confinement, whichever is the later date. But once having established the conviction, the inquiry must end there, and it is improper to inquire into the nature of the crime, the details of the offense, or the time spent in prison as a result thereof.[38]

---

[37] *State v. Poe*, 276 Neb. 258, 754 N.W.2d 393 (2008).

[38] See, *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014); *State v. Johnson*, 226 Neb. 618, 413 N.W.2d 897 (1987).

[28] As to Herrera-Gutierrez' prior history of drug trafficking, Stricklin was authorized to inquire into specific instances of conduct not resulting in conviction under Neb. Evid. R. 608(2), Neb. Rev. Stat. § 27-608(2) (Reissue 2008). There appears to have been some confusion regarding the interplay between rules 608(2) and 609, and we have not previously addressed the issue. However, several federal courts have arrived at a uniform conclusion. They hold that the federal equivalent of rule 608(2) applies only to specific instances of conduct that were not the basis of a criminal conviction. Evidence relating to a conviction is treated solely under the federal equivalent of rule 609.[39] Because rules 608(2) and 609 are substantially similar to their federal counterparts, we adopt the federal courts' conclusion.[40] Rule 608(2) permits questioning during cross-examination only on specific instances of conduct not resulting in a criminal conviction.

[29] Moreover, rule 608(2) conditions inquiry into specific instances of conduct upon the trial court's discretion. And under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.[41] In the case at bar, the district court permitted inquiry into any incidents of prior drug trafficking involving the locations and individuals in this case. But the court determined that any other instances of drug trafficking were too remote for cross-examination. We find no abuse of discretion in this determination. This assignment of error is without merit.

### 4. Jury Instructions

Stricklin contends that instructions Nos. 5 and 6 omitted key and vital language in instructing the jury on the elements of the charged offenses. Specifically, he asserts that the

---

[39] See, *U.S. v. Osazuwa*, 564 F.3d 1169 (9th Cir. 2009); *U.S. v. Lightfoot*, 483 F.3d 876 (8th Cir. 2007); *U.S. v. Parker*, 133 F.3d 322 (5th Cir. 1998); *Mason v. Texaco, Inc*., 948 F.2d 1546 (10th Cir. 1991).

[40] See *Pangborn, supra* note 18.

[41] *State v. Sellers*, 279 Neb. 220, 777 N.W.2d 779 (2010).

instructions failed to charge the jury as to the requirement that the defendant intentionally used a deadly weapon to commit the crime, as to attempted robbery, and as to death as a natural and continuous result of the defendant's acts. He further claims that the omission of such language caused the jury confusion, as evidenced by a letter sent to the trial judge during deliberations. Because only instruction No. 6 pertained to Stricklin, we restrict our analysis to that instruction.

First, there is no indication that instruction No. 6 caused the jury confusion. The letter espoused by Stricklin in his appellate brief does not appear within the record on appeal.

[30] Second, Stricklin failed to object to the district court's jury instructions at trial. The failure to object to instructions after they have been submitted to counsel for review will preclude raising an objection on appeal, unless there is a plain error indicative of a probable miscarriage of justice.[42]

Instruction No. 6 contained no plain error. The jury was instructed on the felony murder theory of first degree murder, and the intentional use of a deadly weapon is not an element of felony murder.[43] While such intentional use is an element of the offense of use of a deadly weapon to commit a felony, instruction No. 6 charged the jury on all of the necessary elements of that offense.

Further, there was no need to instruct the jury as to death as a natural and continuous result of the defendant's acts. The comment to NJI2d Crim. 3.5 provides that "[i]n the normal case there will be no issue regarding causation and no instruction on proximate cause need be given." In the case before us, there was no dispute that Morales' and Noriega's deaths were caused by the gunshot wounds sustained during the robbery at Morales' shop.

And there was no need to instruct the jury as to attempted robbery. Based upon the evidence received at trial, the jury could determine either that Stricklin and Newman were the two black males who had committed the robbery and killed Morales and Noriega, or that they were not. There was no issue

---

[42] *State v. Eagle Bull*, 285 Neb. 369, 827 N.W.2d 466 (2013).

[43] See NJI2d Crim. 3.5.

as to whether the robbery forming the basis for felony murder actually occurred. This assignment of error is without merit.

### 5. Prosecutorial Misconduct

Stricklin assigns that the State committed prosecutorial misconduct during its closing argument. During its argument, the State emphasized the multiple calls between Stricklin and Newman on the morning of December 2, 2012, and the lack of calls between the two after 11:13 a.m.:

> So they're calling back and forth from 9:26 in the morning until 11:13. And in between there on Newman's records, you'll see his calls with [Morales]. At 11:13 . . . Stricklin has no more calls. From 11:13 until 12:34, he has no more calls. And the call that he wants you to believe he's traveling while it's being made, that call wasn't answered at 12:34. Why are there no more calls? The two of them are together. And in my mind, . . . Stricklin turned his phone off. He had no incoming or outgoing calls at all between 11:13 and 12:34.

[31,32] Stricklin objected to the State's comments, and the district court overruled the objection. However, he did not move for a mistrial. When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial.[44] A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct.[45] Stricklin has waived any error resulting from the State's comments due to his failure to move for mistrial.[46] This assignment of error is without merit.

### 6. New Trial

Stricklin assigns that the district court erred in overruling his motion for new trial on the basis of juror misconduct. His arguments relate both to the evidence received by the court

---

[44] *Robinson, supra* note 22.

[45] *Id.*

[46] See *id.*

and to the court's ultimate conclusion that he was not preju-
diced by juror misconduct.

### (a) Facts

After submission of the verdicts, Stricklin moved for a new
trial and attached an affidavit from one of the jurors. In the
affidavit, the juror stated that he had made a telephone call
to his brother after the first day of deliberations and before a
verdict had been reached. During the conversation, the juror's
brother revealed that the juror's family had a connection to the
defendants. The affidavit provided, in relevant part:

> 4. When the phone call was placed, I was the only per-
> son on the jury at that time that wanted to vote not guilty.
>
> 5. The purpose for having a discussion with [my
> brother] about the deliberations was two-fold:
>
> a. First, at some point late in the trial . . . I realized that
> I recognized people in the audience who were familiar to
> me, then subsequently realized that I knew both of the
> defendants and my family has family relationships with
> them. In fact, at some point I learned that . . . Newman
> had an altercation with my father . . . and injured his
> shoulder in the past. . . .
>
> b. Second, I felt that I was being pressured by the other
> jurors to change my vote to guilty and felt that I was in
> a moral dilemma because I didn't think that the State had
> proven their case. I discussed the fact that I wasn't sure
> how long I could hold the other jurors off and maintain
> my position of not guilty.
>
> 6. During the deliberations, the other jurors persuaded
> me to change my vote to guilty primarily because the
> defendants did not testify and attempt to clear their names.
>
> 7. On October 10, 2013[,] I returned to the delib-
> erations room with the other jurors and changed my vote
> to guilty.

A hearing was conducted, and the juror testified that on the
third or fourth day of trial, he had recognized a person in the
audience that he knew from "growing up." The juror spoke
with his brother after the first day of the jury's deliberations.
The juror told his brother that he was serving on a jury for

a murder trial. Although the juror did not inform his brother of Stricklin's or Newman's name, his brother knew about the trial and explained that he knew Stricklin and Newman. The juror's brother told the juror that Stricklin and Newman had known their father from growing up together. Although the juror's brother and father were not his biological family, the juror testified that he considered them as such.

As to the juror's knowledge of Stricklin and Newman, the juror confirmed that prior to the conversation with his brother, he had not made a connection between himself, his family, and either of the defendants. And he testified that he had never met Stricklin or Newman and that he had not known who they were. Additionally, the juror indicated that his brother did not inform him that Newman and their father had a negative history or relationship. And his brother did not tell the juror that Newman and their father had ever been involved in a physical altercation.

The juror also testified as to his vote, and he confirmed that he had discussed his desire to vote not guilty with his brother. The juror told his brother that he was the only member of the jury who wanted to vote not guilty and that he did not know what he was going to do.

At the hearing, the district court excluded certain portions of the juror's affidavit on the basis that they impermissibly revealed the juror's mental processes under Neb. Evid. R. 606(2), Neb. Rev. Stat. § 27-606(2) (Reissue 2008). However, in its subsequent written order, the court stated that the portions were excluded because they were misleading.

Additionally, the district court received an affidavit from the presiding juror, stating that no outside or personal information regarding either Stricklin or Newman was brought to the jury's attention during deliberations.

The district court overruled Stricklin's motion for new trial. The court agreed that the juror had committed misconduct in communicating with his brother during deliberations; however, it concluded that no prejudice resulted from the misconduct. And it further rejected the defendants' assertion that the juror had committed additional misconduct in failing to reveal his family connection with the defendants.

### (b) Resolution

#### (i) Evidence

Stricklin's arguments as to the evidence considered by the district court pertain to the stricken portions of the juror's affidavit. The court excluded all portions of the affidavit relating to the juror's vote, the jury's deliberations, the juror's knowledge of Stricklin and Newman, and the altercation between the juror's father and Newman. And during the juror's testimony, it further prevented the defendants from inquiring into whether the juror believed that the State had failed to meet its burden of proof, whether the juror had been experiencing a "moral dilemma," and whether the jury had considered the defendants' failure to testify.

We find no prejudicial error in the exclusion of the above evidence. The admissibility of evidence concerning the validity of a jury's verdict is governed by rule 606(2), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

[33] Additionally, we have explained that no evidence may be received concerning the effect of any statement upon a juror's mind, its influence upon the juror, or the mental processes of a juror.[47] Rule 606(2) does not allow a juror's affidavit to impeach a verdict on the basis of jury motives, methods,

---

[47] See *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002).

misunderstanding, thought processes, or discussions during deliberations.[48]

The juror's statements as to his desire to vote not guilty, pressure from the other jurors to change his vote, the juror's "moral dilemma," and the jury's reliance upon the defendants' failure to testify fell directly within the purview of rule 606(2). These statements revealed the juror's mental processes and attempted to impeach the jury's verdicts on the basis of its motives, methods, and discussions during deliberations. As such, the statements were inadmissible and could not have been considered by the district court. And the questions posed to the juror during his testimony similarly attempted to elicit such improper information.

Stricklin argues that the district court's exclusion of the above statements, particularly the jury's reliance upon the defendants' failure to testify, violated the court's duty to undertake a full investigation into the allegations of juror misconduct. And he cites the U.S. Court of Appeals for the Fifth Circuit's holding in *United States v. McKinney*[49] that when jury misconduct is alleged in a motion for new trial, the trial judge must conduct a full investigation to ascertain whether jury misconduct actually occurred and, if it occurred, the judge must determine whether or not it was prejudicial.

[34] We have held that when an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred. If it occurred, the trial court must then determine whether it was prejudicial to the extent that the defendant was denied a fair trial. If the trial court determines that the misconduct did not occur or that it was not prejudicial, adequate findings are to be made so that the determination may be reviewed.[50]

---

[48] See *id*.

[49] *United States v. McKinney*, 429 F.2d 1019 (5th Cir. 1970).

[50] *State v. Arnold*, 253 Neb. 789, 572 N.W.2d 74 (1998).

However, this duty to hold an evidentiary hearing does not extend into matters which are barred from inquiry under rule 606(2). And the jury's consideration of the defendants' failure to testify was clearly barred from inquiry under that rule.[51] The district court permitted the juror to be examined as to the nature of the alleged misconduct and the extent of the extraneous information that he received. We see no violation of the court's duty to conduct an evidentiary hearing.

As to the statements in the affidavit regarding the juror's knowledge of Stricklin and Newman and the altercation between Newman and the juror's father, the exclusion of the statements did not cause Stricklin prejudice. At the hearing, the defendants were permitted to question the juror as to his conversation with his brother, his family's relationship with the defendants, his knowledge of the defendants, and whether he had been informed of any negative history or altercation involving his father and Newman.

Finally, we find no error in the district court's receipt of the affidavit of the presiding juror. The affidavit merely denied that extraneous information was brought to the jury's attention during deliberations. Rule 606(2) permits a juror to provide evidence on the limited question of "whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

### (ii) Misconduct

[35] Stricklin also challenges the district court's ultimate conclusion that he was not prejudiced by juror misconduct. We review the trial court's determinations of witness credibility and historical fact for clear error and review de novo the trial court's ultimate determination whether the defendant was prejudiced by juror misconduct.[52]

---

[51] See, *U.S. v. Kelley*, 461 F.3d 817 (6th Cir. 2006); *U.S. v. Rodriquez*, 116 F.3d 1225 (8th Cir. 1997).

[52] See, *State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010); *State v. Podrazo*, 21 Neb. App. 489, 840 N.W.2d 898 (2013).

[36,37] A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.[53] In a criminal case, misconduct involving an improper communication between a nonjuror and a juror gives rise to a rebuttable presumption of prejudice which the State has the burden to overcome.[54]

The record establishes that the juror committed misconduct in communicating with his brother during deliberations. The juror testified that he called his brother during deliberations and discussed the status of his vote and the other jurors' votes prior to the submission of the verdicts. This was clear misconduct.

[38] However, we agree with the district court that Stricklin was not prejudiced by the extraneous information received by the juror during the telephone call to his brother. Whether prejudice resulted from jury misconduct must be resolved by the trial court's drawing reasonable inferences as to the effect of the extraneous information on an average juror.[55] The test to determine whether extraneous material was prejudicial looks to the possible effect of the extraneous material on an average juror's deliberative process.[56]

The extraneous information received by the juror would not have affected an average juror's deliberative process. The district court determined that the juror had testified credibly that his brother informed him only that his father and the defendants had a neutral acquaintance. The juror confirmed that his brother did not tell him that his father and Newman had a negative history or relationship or that his father and Newman had been involved in a physical altercation. We agree with the district court that such knowledge of a neutral family

---

[53] *Thorpe, supra* note 52.

[54] *Id*.

[55] *Id*.

[56] *State v. Harrison*, 264 Neb. 727, 651 N.W.2d 571 (2002).

acquaintance would not motivate an average juror to change his vote from not guilty to guilty.

Moreover, the jury was instructed to determine the facts based solely upon the evidence presented at trial and to disregard any personal knowledge. And the affidavit of the presiding juror established that no extraneous information was presented to the other jurors during deliberations. Based upon the nature of the extraneous information received by the juror, the limitation of that information to the juror, and the instruction to disregard personal knowledge, we conclude that the juror's misconduct did not prejudice Stricklin and deprive him of a fair trial.

Stricklin claims that in addition to communicating with a nonjuror, the juror committed misconduct in failing to reveal his family connection to the defendants prior to the submission of the verdicts. However, this claim similarly fails for lack of prejudice. As previously discussed, the district court determined that the juror had testified credibly that his brother revealed only a neutral family acquaintance with the defendants. And the juror testified that he did not personally know the defendants and that he never knew who they were. Thus, assuming that the juror committed misconduct in failing to reveal his family connection, Stricklin failed to show that such a remote connection prevented the juror from being impartial. This assignment of error is without merit.

### 7. Withdrawal of Rest

Stricklin contends that the district court erred in overruling his motion to withdraw his rest and to submit additional evidence on the issue of juror misconduct. After the hearing on his motion for new trial, Stricklin sought to introduce an affidavit from the juror's brother that provided:

> When [the juror] called me the first day of deliberations, it was clear that he knew that our family knows the Defendants. He wasn't honest when he said at the Motion for New Trial that he didn't really know the Defendants. He told me that he didn't recognize them until he recognized people in the audience.

The district court overruled the motion to withdraw rest and excluded the affidavit. On appeal, Stricklin contends that the relevant factors weighed in favor of reopening the evidence and receiving the affidavit.

[39] Among factors traditionally considered in determining whether to allow a party to reopen a case to introduce additional evidence are (1) the reason for the failure to introduce the evidence, i.e., counsel's inadvertence, a party's calculated risk or tactic, or the court's mistake; (2) the admissibility and materiality of the new evidence to the proponent's case; (3) the diligence exercised by the requesting party in producing the evidence before his or her case closed; (4) the time or stage of the proceedings at which the motion is made; and (5) whether the new evidence would unfairly surprise or unfairly prejudice the opponent.[57]

The district court considered the above factors, and it determined that the defendants had not been diligent in offering the affidavit of the juror's brother. The brother was known to the defendants prior to the hearing, but they did not produce his statements.

And the district court further observed that receiving the affidavit would result in unfair surprise or unfair prejudice. At the hearing on the motion for new trial, the witnesses had been sequestered and, thus, they were not present for each other's testimony. The brother's affidavit "skirt[ed] the hearing's sequestration order," because it attempted to impeach the testimony given by the juror. If the brother had been present at the hearing, he would not have been allowed to hear and respond to the juror's testimony.

Based upon the district court's analysis of the relevant factors, we see no abuse of discretion in the denial of Stricklin's motion to withdraw his rest and to reopen the evidence. This assignment of error is without merit.

## VI. CONCLUSION

We find no merit to Stricklin's assertions that the district court erred in consolidating his and Newman's trials, excluding

---

[57] *Myhra v. Myhra*, 16 Neb. App. 920, 756 N.W.2d 528 (2008).

the statements of the confidential informant, and instructing the jury. And the court did not abuse its discretion in limiting the scope of his cross-examination of Herrera-Gutierrez, overruling his motion for new trial, and denying his request to reopen the evidence. Further, Stricklin failed to preserve his claim of prosecutorial misconduct for appellate review. We affirm Stricklin's convictions and sentences.

Affirmed.

Heavican, C.J., not participating.

———————————

State of Nebraska, appellee, v. Terrell E. Newman, also known as Monroe E. Terrell, also known as Edward N. Terrell, appellant.

___ N.W.2d ___

Filed April 3, 2015.    No. S-14-229.

1. **Identification Procedures: Due Process: Appeal and Error.** A district court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.

2. **Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

4. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

5. **Motions for Mistrial: Appeal and Error.** Whether to grant a mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion.

6. **Constitutional Law: Identification Procedures: Due Process.** The Due Process Clause does not require a preliminary judicial inquiry into the reliability of an